UNITED STATES DISTRICT COURT
                               DISTRICT OF MAINE

N. DENIS HAWKESWORTH &            )
CYNTHIA S. VAIL,                  )
                                  )
           Plaintiffs,            )
                                  )  Docket no. 2:10-cv-232-GZS
v.                                )
                                  )
NATIONWIDE MUTUAL INSURANCE       )
COMPANY, et al.,                  )
                                  )
                                  )
           Defendants.            )


                    **ORDER ON MOTION FOR SUMMARY JUDGMENT**

  Before the Court is the Motion for Summary Judgment by Defendant Nationwide Insurance Company ("Nationwide") (Docket # 16). As explained herein, the Court GRANTS IN PART AND DENIES IN PART Defendant's Motion for Summary Judgment.

**I.  LEGAL STANDARD**

  Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. A "material fact" is one that has "the potential to affect the outcome of the suit under the

applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993) (citing Anderson, 477 U.S. at 248) (additional citation omitted).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); see also Fed. R. Civ. P. 56(e). "Mere allegations, or conjecture unsupported in the record, are insufficient." Barros-Villahermosa v. United States, -- F.3d --, No. 09-2614, 2011 WL 1447743, at *2 (1st Cir. Apr. 15, 2011) (quoting Rivera-Marcano v. Normeat Royal Dane Quality A/S, 998 F.2d 34, 37 (1st Cir. 1993)); see also Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation.") (citations omitted). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." In re Spigel, 260 F.3d 27, 31 (1st Cir. 2001) (quoting In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993)).

## II. FACTUAL BACKGROUND

Construing the record in accordance with the just-described standard, the Court finds the following undisputed facts:

### A. The Hawkesworth House

Plaintiffs N. Denis Hawkesworth and Cynthia S. Vail entered into a purchase and sale agreement with RTG, Inc. ("RTG") and B & M Construction, Inc. ("B & M") on September 25, 2001. Under this agreement, RTG would eventually sell to Plaintiffs land in Falmouth with a house upon the land constructed by B & M. The Town of Falmouth issued the certificate of occupancy for this house (the "Hawkesworth house") on May 7, 2002. In July of 2002, Plaintiffs moved into their new home.

The first winter after moving into the Hawkesworth house Plaintiffs experienced problems with the furnace/power venter. Plaintiffs also experienced one leak in the flat roof above their entranceway that caused a small stain on the interior ceiling. This leak was repaired under their home warranty by Darryll Norton, a subcontractor for B & M who had worked on the initial roofing of the house. Plaintiffs did not experience other significant problems in the first year but started noticing additional problems in late 2003 and early winter 2004. These problems included a leak in the basement and a burst pipe in the garage.[1] The winter also brought significant ice damming and ice buildup on the roof. During this period, Plaintiffs continued to notice a small water stain on the ceiling in the foyer area of their house.

---

[1] In the personal notes produced by Mr. Hawkesworth at his July 15, 2009 deposition, Hawkesworth indicated these problems began in November 2003. (See Hawkesworth Notes (Docket # 11-4) at PageID 878)

Jumping forward several years, in mid-2008, the roof over the foyer was eventually repaired by Josh Marr. In doing this repair, Marr notified Hawkesworth as to the lack of flashing on this area of the roof. Even after this repair work by Marr, the stain on the ceiling continued to grow much larger in the latter half of 2008. In response to the growing stain and significant leaking, Plaintiffs called a new contractor, Dave Haskell. In the course of attempting to affect a repair to this leak in December 2008, Haskell discovered numerous defects and deficiencies in the construction of the Hawkesworth house. The defects and deficiencies discovered include: (1) windows without proper flashing and caulking, (2) no flashing installed where rooflines met other rooflines and where rooflines met sidewalls, (3) no silicone or flashing at butt joints in the siding and in the window trim, (4) the chimney chase was improperly installed, (5) the chimney chase was not correctly flashed, (6) the radius roofs in the front and over the dormer windows were not flashed, and (7) improperly installed siding on the house. (Haskell Aff. ¶ 5.) As indicated in his affidavit, Haskell believes that these defects and deficiencies "caused water penetration" into the Hawkesworth house that began "almost immediately upon completion of construction" and remained "continuous and progressive since the time of construction." (Haskell Aff. ¶ 10.) Plaintiffs also learned from Haskell that there was mold in the Hawkesworth house.

Although Plaintiffs were aware of water leaks and other problems before December 2008, Hawkesworth did not consider these problems to be "major" problems until the mold was discovered. (Hawkesworth Dep. at 173.) Since discovering the mold, Hawkesworth and Vail have moved out of the house. In February 2009, the Hawkesworth house was evaluated for indoor air quality at the request of counsel in preparation for the filing a lawsuit in state court. Plaintiffs' counsel also retained an appraiser, Albert Childs, to assess the value of the property.

According to Childs, the lot containing the Hawkesworth house had an assessed value of $151,300 in 2009. Childs opined that the property might only be worth this assessed value in light of the damage to the structure.[2]

In or around May 2009, Hawkesworth began seeking treatment for symptoms such as dizziness, fatigue, sore throat, memory problems and headaches. Hawkesworth recalls experiencing these symptoms in mid-2008 but did not seek treatment until Spring 2009. David Spence, P.A., Hawkesworth's primary care provider, connected these symptoms to mold exposure. By early 2009, Cynthia Vail was diagnosed with acid reflux. When she was deposed in July 2009, she was preparing to undergo additional medical tests to determine whether mold inhalation played a role in her acid reflex. Absent evidence of mold causing her acid reflux, Vail and her doctors believed that her acid reflux was caused by stress.[3]

### B. The Underlying State Case

On March 13, 2009, less than seven years after moving into their newly-constructed house, Hawkesworth and Vail brought suit in the Maine Superior Court against RTG and B & M, along with other named defendants, alleging that defects in the construction of their house resulted in subsequent water penetration into the home, which, in turn, caused damage to the home including, but not limited to, rot and dry rot to sheathing, siding and structural members of the house as well as water and mold damage affecting sheetrock, insulation and electrical

---

[2] Defendant's Statement of Material Facts asserts a number of additional facts related to the expert designations and expert reports filed by Plaintiffs in the underlying state case. (See Defs. SMF (Docket # 17) at 7-9.) Plaintiffs object to a number of these proposed statements of material fact on evidentiary grounds. (See Pls. Responsive SMF (Docket # 24) at 9-20.) In light of the Court's conclusion that there is a trialworthy issue as to coverage for property damage, the Court need not and does not resolve these objections. Rather, the Court simply notes that even if it were to resolve all of the objections in favor of Defendant and include all of the proposed facts, it would not change the outcome of this Motion.

[3] Notably, Vail has worked as a physician assistant since 1994.

fixtures. The multi-count complaint pressed claims for negligence, breach of contract, fraud, unfair trade practices and negligent infliction of emotional distress.

The state case, captioned <u>Hawkesworth v. B & M Construction Co., Inc., et al.</u>, Cumberland County Sup. Ct. Docket # CV-09-149 (the "State Case"), was settled resulting in a consent judgment against RTG and B & M for $750,000. This stipulated judgment was entered on March 11, 2010. In relevant part, the stipulation explains:

> [RTG and B & M] acknowledge and agree that the Plaintiffs have suffered property damage and personal injury as a result of the problems associated with the construction of their Falmouth home by the [RTG and B & M].
> [RTG and B & M] acknowledge and stipulate that Albert Childs, a certified general appraiser had opined that the home at the present time has no fair market value because of damage caused by water penetration and because of construction defects. Plaintiffs' paid $409,000 for the property at the closing in June 2002.
> [RTG and B & M] acknowledge and stipulate Plaintiffs have incurred significant attorneys' fees and costs in the amount of $64,981.63 to date in the prosecution of this case and that the Plaintiffs are entitled to recover attorneys' fees and costs pursuant to the Unfair Trade Practices Act for breaches of warranty.

(Stipulation of Judgment (Ex. B to Compl.) (Docket # 1-3) at 1.)

The Stipulation of Judgment was signed and filed in accordance with a settlement agreement entered into between the plaintiffs, Hawkesworth and Vail, and RTG and B & M (hereinafter "B & M Settlement Agreement") (Docket # 17-1). The B & M Settlement Agreement was signed by all parties in February 2010. (<u>See</u> B & M Settlement Agreement (Docket # 17-1) at Page ID# 1443-47.) Pursuant to this agreement, Plaintiffs agreed to limit their recovery under the stipulated judgment to available insurance proceeds and not seek to enforce the judgment against RTG and B & M directly. In relevant part, the Settlement Agreement expressly stated:

6

Relying upon Patrons Oxford Ins. Co. v. Harris, 2006 ME 72, 905 A.2d 819, Plaintiffs and [RTG and B & M] agreed to a settlement in which [RTG and B & M] will stipulate to liability to Plaintiffs and to the entry of a judgment . . . in favor of Plaintiffs in exchange for Plaintiffs' agreement that . . .they will limit their recovery of the judgment to available insurance proceeds.

In executing the Settlement Agreement it is [RTG and B & M]'s desire to protect themselves from personal liability to Plaintiffs while preserving for their insurer the meaningful opportunity to protect its interest in a declaratory judgment action to determine the availability of liability coverage with respect to Plaintiffs' claims.

(B & M Settlement Agreement (Docket # 24-2) ¶¶ 10 & 14.)

Plaintiffs also entered into a separate settlement with Darryll Norton for $90,000 on May 5, 2010 (hereinafter "Norton Settlement Agreement"). In relevant part, this Settlement Agreement reads:

In further consideration of the payment of [$90,000], and pursuant to 14 M.R.S.A. § 163 and Maine law, [Hawkesworth and Vail] agree to indemnify [Norton] for any suits or claims by any other person or entity for the [Norton's] share of responsibility or liability, if any, for injuries and damages sustained by [Hawkesworth and Vail] as a result of said home construction.

(See Norton Settlement Agreement (Docket # 17-1) at PageID# 1432.)

### C. B & M's Nationwide Insurance Policy

As relevant to this case, Defendant Nationwide Mutual Insurance Company insured B & M and RTG under a commercial general liability policy, which was first issued on May 7, 2003. That Nationwide policy for B & M was renewed through May 7, 2008. The Nationwide policy for RTG was further renewed through May 7, 2009.

In relevant part, all of these Nationwide policies stated:

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. The following exclusion is added to Paragraph 2., Exclusions of **Section I Coverage A- Bodily Injury and Property Damage Liability**:

2. Exclusions
This insurance does not apply to:

**Fungi or Bacteria**
a. "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

b. Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

* * * *

C. The following definition is added to the Definitions Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

(Pls. Compl. Ex. C at PageID# 179 (identifying CG 21 67-0402) (hereinafter, the "Fungi Exclusion" or "B&M 114" (the bates stamped page number)).)

**D. Nationwide's Reservation of Rights**

In the State Case, Nationwide provided representation to B & M pursuant to three reservation of rights letters, dated May 14, 2009, May 18, 2009, and September 30, 2009. (See Ex. B to the B & M Settlement Agreement (Docket # 24-2).) It was only in its final reservation of rights letter, dated September 20, 2009, that Nationwide first asserted that the claims by Hawkesworth and Vail fell within the Fungi Exclusion. Prior to issuing that final reservation of rights letter, Attorney Billings entered an appearance on behalf of B & M, RTG and Robert

8

Blackburn on May 28, 2009. Attorney Billings then attended at least four depositions prior to the issuance of Nationwide's third reservation of rights letter.

Nationwide again reiterated its reservation of rights in response to being notified of the pending settlement in the State Case. In a letter dated February 25, 2010, counsel for Nationwide indicated that it did not believe its policies provided coverage for the reasons stated in the three prior reservation of rights letters and that it considered "the dollar amount of the proposed judgment to be beyond the range of a reasonable verdict." (Ltr. from Attorney Douglas (Docket # 17-1) at PageID# 1453.) Nonetheless, the parties proceeded to settle the State Case. The B & M Settlement Agreement attached and referenced Nationwide's three reservation of rights letters.

## III. DISCUSSION

In this reach and apply case, the issue to be resolved is which, if any, insurer can be required to pay towards the stipulated judgment entered against RTG and B & M. Maine's reach and apply statute, 24-A M.R.S.A § 2904, "provides a cause of action to a person who recovers a final judgment against the judgment debtor to reach and apply insurance coverage to satisfy the judgment if (1) the judgment debtor was insured against such liability when the right of action accrued; and (2) the insurer was given notice of such accident, injury, or damage before the recovery of the judgment." Sarah G. v. Maine Bonding & Cas. Co., 866 A.2d 835, 837 (Me. 2005) (citing Marston v. Merchs. Mut. Ins. Co., 319 A.2d 111, 113 (Me. 1974)). Pursuant to this

9

first prong,[4] the burden is on the plaintiff in a reach and apply action to establish coverage. It is then the insurer's burden to establish that the claim is subject to a policy exclusion. See, e.g., Patrons Oxford Ins. Co. v. Harris, 905 A.2d 819, 827 & n. 6 (Me. 2006) (citing Mut. Fire Ins. Co. v. Hancock, 634 A.2d 1312, 1312-13 (D. Me. 1993)); see also Middlesex Mutual Assur. Co. v. Fish, 738 F. Supp. 2d 124, 132 (D. Me. 2010). In the pending Motion, Nationwide primarily argues that it is entitled to judgment as a matter of law because all of Plaintiffs' claimed damages fall within the Fungi Exclusion.

### A. Waiver

Before turning to the issue of whether Plaintiffs' claims fall within the Fungi Exclusion, the Court first considers Plaintiffs' argument that Nationwide waived its right to invoke the Fungi Exclusion since it defended its insured for four months prior to issuing a reservation of rights letter that explicitly invoked the Fungi Exclusion. In the Court's assessment, there is no merit to Plaintiffs' argument that the delayed invocation of the Fungi Exclusion amounted to a "voluntary and knowing relinquishment" of this basis for reserving the right to deny coverage. Roberts v. Maine Bonding & Cas. Co., 404 A.2d 238, 241 (A.2d 1979) (distinguishing waiver from estoppel). With two prior reservation of rights letters already issued, Nationwide was entitled to clarify its basis for possibly denying coverage as the factual record developed during discovery.

Moreover, the fact remains that Nationwide reserved its right to deny coverage based on the Fungi Exclusion on September 20, 2009, five months prior the consummation of the B & M Settlement Agreement pursuant to which the stipulated judgment was entered. Under this timeline, there is also no basis for finding that Nationwide should be equitably estopped from

---

[4] In this case, there is apparently no dispute regarding the second prong.

denying coverage based on the Fungi Exclusion.[5] See Am. Nat'l Fire Ins. Co. v. York, 575 F.3d 112, 118-19 (1st Cir. 2009) (describing the application of equitable estoppel in the context of an insurer's reservation of rights).

### B. Plaintiffs' Claimed Damages

Having determined that Nationwide reserved its rights to deny coverage based on the policy's Fungi Exclusion, Nationwide asks the Court to find that it is entitled to judgment as a matter of law because all of Plaintiffs' claims fall within the Fungi Exclusion. As the insurer, it is Nationwide's burden to prove Plaintiffs' bodily injury and property damage claims are subject to a policy exclusion. See Am. Guar. & Liab. Ins. Co. v. Timothy S. Keiter, P.A., 360 F.3d 13, 17 (1st Cir. 2004) ("Under Maine law, insurers bear the burden of proving the applicability of policy exclusions, and any ambiguity as to the meaning of the policy language is construed against the insurer.")

#### 1. Bodily Injuries

The Court first considers whether Nationwide has proven that there is no genuine issue of material fact as to whether Plaintiffs' claimed bodily injuries fall within that exclusion. Plaintiffs argue that to the extent their bodily injury claims are caused by stress or emotional distress, the claims are "unrelated to fungus exposure" and "not subject to the fungus exclusion." (Pls. Response (Docket # 23) at 16.) Even accepting all reasonable inferences in Plaintiffs' favor, the Court concludes the record is not trialworthy as to bodily injuries. Under the explicit language of the Fungi Exclusion, bodily injuries are excluded if the injuries "would not have occurred in whole or *in part*, but for the actual, alleged or threatened inhalation of, ingestion of, contact with,

---

[5] In any event, Plaintiffs have indicated that they are not pressing an equitable estoppel argument. (See Pls. Sur-Reply (Docket # 35) at 7.)

exposure to, existence of, or presence of, any 'fungi' or bacteria . . . *regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage*." (B & M 1114 (emphasis added).) In this case, Plaintiffs were only prompted to seek medical care and move out of the home upon discovery of mold. Prior to the discovery of mold, there is nothing in the record to suggest that either Plaintiff reported or sought care for any bodily injury. Assuming that all of the medical problems Hawkesworth and Vail reported in 2009 could be directly attributed to stress and emotional distress, their own deposition testimony still proves that the existence of mold was a partial but-for cause of their injuries. In short, the Court finds that the summary judgment record amply supports a finding that Plaintiffs' claimed bodily injuries are subject to the Fungi Exclusion found in the Nationwide policy.

    **2. Property Damage**

Turning to the claimed property damage, there is no dispute regarding the fact that the Hawkesworth house sustained property damage during the Nationwide coverage period. While Nationwide strenuously argues that all of the claimed property damage falls within the Fungi Exclusion, Plaintiffs argue that there are genuine issues of material fact regarding whether property damage resulting from construction defects and subsequent water penetration falls within this Exclusion.

In considering whether the Fungi Exclusion can be read to encompass property damage caused by water penetration, rot and/or dry rot, the Court must consider the language in another section of the same Nationwide policy, titled "Fungus Amendatory Endorsement." (See Ex. C. to Compl. (Docket # 1-4) at PageID#143/B&M 1078). Comparing this endorsement, which pertains only to Commercial Property Coverage, to the Fungi Exclusion, one sees explicit references to "wet rot" and "dry rot" as well as language excluding "loss or damage caused

directly or indirectly by the continuous or repeated seepage or leakage of water" in the Fungus Amendatory Endorsement. Id. In the Court's assessment, the Fungus Amendatory Endorsement provides a clear example of Nationwide using explicit and unambiguous language to exclude coverage for rot and water penetration, albeit in the context of commercial property. The failure to include the same language in the Fungi Exclusion would lead an objectively reasonable insured who read both of these sections of the policy to conclude that the Fungi Exclusion did not include dry rot, wet rot and water penetration. Alternatively, the difference in the language found in the Fungi Exclusion and the Fungi Amendatory Endorsement, creates an ambiguity that, under Maine law, must be construed against the insurer. Maine Mut. Fire Ins. Co. v. Am. Intern. Underwriters Ins. Co., 677 A.2d 1073, 1075 (Me. 1996) ("If there is any ambiguity in insurance policy language involving coverage, we construe that language in favor of the insured and against the insurer. . . . Accordingly, ambiguities in exclusionary clauses are construed narrowly.") In short, the Court cannot conclude as a matter of law that water penetration and rot (dry or wet) are subject to the Fungi Exclusion.

With respect to the factual record, there is undisputed evidence that mold has been detected in connection with the damage to the Hawkesworth house. Beyond that, most of the evidence regarding the cause or causes of the property damage is disputed. In fact, the evidence in the summary judgment record does not resolve what, if any, causal relationship there is between the mold in the Hawkesworth house and the construction defects, water penetration, and rot. Absent undisputed evidence that all of the damage to the Hawkesworth house was at least partially caused by mold, fungi or bacteria, Nationwide cannot obtain summary judgment based

on the Fungi Exclusion.[6]  By all accounts, this is a high hurdle.  The conclusion that Nationwide cannot cross this undisputed evidence hurdle does not by any means foreclose a later verdict in favor of Defendant based on a preponderance of the admissible evidence.  Nonetheless, the Court concludes that there is a trialworthy issue as to whether all of Plaintiffs' property damage is subject to the Fungi Exclusion.

In reaching this conclusion, the Court does not endorse the "efficient proximate cause" doctrine, which Plaintiffs invoke in their opposition to the pending Motion.  (See Pls. Response (Docket # 23) at 15-16.)  As was noted in First Specialty Ins. Corp. v. Maine Coast Marine Const., Inc., 532 F. Supp. 2d 188 (D. Me. 2008), the Maine Law Court has "not yet recognized" the efficient proximate cause rule.  Id. at 196.  In affirming First Specialty, the First Circuit similarly acknowledged the lack of clarity as to the application of the efficient proximate cause doctrine under Maine law.  See First Specialty Ins. Corp. v. Am. Home Assur. Co., 558 F.3d 97, 105 (1st Cir. 2009).  In this case, the Nationwide policy explicitly states that coverage for mold is excluded "regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury."  (B & M 1114.)  The Court is satisfied that even if the efficient proximate case doctrine were recognized in Maine, it would not override this unambiguous language.  See, e.g., Rolyn Companies, Inc. v. R & J Sales, 671 F. Supp. 2d 1314, 1332-33 (S.D. Fla. 2009) (finding similar policy language prevented the application of Florida's efficient proximate cause doctrine).

---

[6] In fact, in opposing summary judgment, Plaintiffs argue:  "Even if no mold were detected in the home, it would still be necessary to demolish Plaintiffs' home in order to correct the numerous structural deficiencies in the house due to defective construction." (Pls. Sur-Reply (Docket # 35) at 3.)

## C. Impact of Norton Settlement

Nationwide also argues that the Norton Settlement, under which Plaintiffs received $90,000 should act as an offset as to any damages in accordance with 14 M.R.S.A § 163.[7] Nationwide has cited no cases to support this argument. By its clear terms, 14 M.R.S.A § 163 provides an offset for a jury verdict against one tortfeasor when a second joint tortfeasor settles before trial. In this case, assuming B & M, Nationwide's insured, and Norton could be deemed joint tortfeasors,[8] neither went to trial. Additionally, B & M settled first and the Norton settlement followed. Under these facts, 14 M.R.S.A. § 163 does not require or envision that this Court would offset the April 2010 Norton Settlement against any amounts due pursuant to the February 2010 B & M settlement. In short, the Court has found no cases applying 14 M.R.S.A. § 163 in a reach and apply action and, on the record presented, declines to say that the rule has any application to this case.

## D. Reasonableness of Settlement

If the preponderance of evidence at trial establishes that at least some of the underlying property damage is subject to coverage, Nationwide has very limited defenses. See, e.g., Colony Ins. Co. v. Danly, Inc., 755 F. Supp. 2d 219, 223 (D. Me 2010) (quoting Patrons, 905 A.2d at

---

[7] Nationwide argues that this offset would completely cover Plaintiffs' damages under based on evidence that the estimated cost of repairs is less than $83,000. (See Def. Mot. for S.J. (Docket # 16) at 7 & Def. SMF ¶ 30.) As should be apparent from the Court's recitation of the undisputed facts, it does not accept Defendants' assertions regarding the quantification of damages as an undisputed fact for purposes of the pending motion. Nonetheless, it appears wise to address the legal question raised regarding the impact of the Norton settlement.

[8] Plaintiffs' actually question this point in light of Justice Crowley's March 31, 2010 summary judgment ruling in the State action, which limited Plaintiffs' potential recovery against Norton. (See Order on Def. Daryl Norton's Motion for S.J. (Docket # 17-1) at PageID # 1415-30.)

828).  Under Maine law, once coverage is found to exist for at least a portion of an unallocated damage award, Defendant is left to defend by showing that the settlement reflects fraud, collusion or is otherwise unfair and unreasonable.  See Patrons, 905 A.2d at 828-29 ("If the insurer prevails on the coverage issue, it is not liable on the settlement. If the insurer does not prevail as to coverage, it may be bound by the settlement, provided the settlement, including the amount of damages, is shown to be fair and reasonable, and free from fraud and collusion.").

Here, the stipulated judgment entered in the State Case ultimately does not allocate the $750,000 in damages awarded to Plaintiffs.  Nonetheless, Defendant has argued that the $750,000 is "on its face unreasonable." (Def. Reply (Docket # 32) at 6.)  While Defendant is free to pursue this defense at trial, the record presented, combined with the inherent nature of a "reasonableness" determination, simply do not allow this issue to be resolved on summary judgment.

## IV.   CONCLUSION

For the reasons just explained, the Court hereby GRANTS IN PART AND DENIES IN PART the Motion for Summary Judgment by Defendant Nationwide Insurance Company (Docket # 16).  Plaintiffs may proceed to trial on the portion of Count I that seeks to reach and apply insurance coverage for property damage.  To the extent Count I sought to reach and apply coverage for bodily injury, Defendant is entitled to summary judgment in its favor.

SO ORDERED.

                                                      /s/ George Z. Singal
                                                     United States District Judge

Dated this 21st day of June, 2011.